UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No.   11-CR-219 SRN/SER |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Andre George Mehilove, | |
| Defendant. | |

Laura M. Provinzino, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

Manvir K. Atwal, Esq., Office of the Federal Defender, 107 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 21] and Motion to Suppress Statements, Admissions, and Answers [Doc. No. 22].[1]  This matter has been referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.

**I.    BACKGROUND**

On July 6, 2011, the Government filed an Indictment charging Defendant Andre George Mehilove a/k/a Andrejs Solanikovs, a/k/a Andre George Solanikov ("Mehilove") with Counterfeiting Postage Stamps in violation of 18 U.S.C. § 501 and filed a Superseding Indictment on August 2, 2011 [Doc. No. 8] charging Mehilove with Forfeiture in violation of 18

---

[1]The non-dispositive pretrial motions [Doc. Nos. 14, 17-20] were addressed in a separate Order [Doc. No. 30].

U.S.C. § 492, § 982(a)(2)(B) and 28 U.S.C. § 2461(c) . At the August 25, 2011 motions hearing, Postal Inspector John Western ("Inspector Western") testified on behalf of the Government. The Court received five exhibits into evidence: an Application and Affidavit for Search Warrant (09-MJ-124) (JSM) (Gov't Ex. 1); Memorandum of Interview Dated 4/3/09 (Gov't Ex. 2); U.S. Postal Inspection Service Miranda Card (Gov't Ex. 2A); Memorandum of Interview Dated 4/7/09 (Gov't Ex. 3); and Memorandum of Interview Dated 5/21/09 (Gov't Ex. 4). This matter is set for trial before United States District Judge Susan Richard Nelson.

## II.     FACTS

Inspector Western investigates crimes with a nexus to the U.S. mail and beginning in 2007 served as the case agent investigating Mehilove's activities.[2] (Tr. 8-9). The search warrant and affidavit described a two-year investigation into the use of several Stamps.com meters connected to Mehilove or one of his aliases of "Andre Solanikov" and "Andrejs Solanikovs." (Gov't Ex. 1). The meters were used to counterfeit meter stamps. (Gov't Ex. 1). Postal Inspectors confirmed that addresses associated with the postage meters used to counterfeit meter stamps were linked to Mehilove. (Gov't Ex. 1).

Magistrate Judge Janie S. Mayeron determined that there were adequate facts to establish probable cause and granted a search warrant for Mehilove's Prior Lake residence, three cars, and items listed in Attachments A-C on April 3, 2009,. (Gov't Ex. 1, at 1, 18-22)[Doc. No. 1]. The search warrant also contained an addendum stating that law enforcement would search electronic files, documents, or other electronically stored information in a manner that minimized accessing information that implicated attorney-client privilege or involved information not identified in the search warrant. (Gov't Ex. 1, at 24).

---

[2] The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Andre George Mehilove*, (11CR219), August 25, 2011 [Doc. No. 26] ("Tr.").

**A.  April 3, 2009**

Inspector Western searched Mehilove's home on the same day Magistrate Judge Mayeron granted the search warrant.  (Gov't Ex. 1); (Tr. 9).  Inspector Western's partner, Postal Inspector Greg[3] Bouchie ("Inspector Bouchie"), and two or three Immigration and Customs Enforcement ("I.C.E.") agents arrived at Mehilove's residence in Prior Lake, Minnesota, ahead of Inspector Western.  (Tr. 11, 23).   None of the agents were uniformed, but some were wearing "Inspector" jackets and carrying weapons.  (Tr. 23-24).   Before Western arrived, Inspector Bouchie informed Mehilove that a federal search warrant was issued for his residence.  (Tr.  11). Inspector Bouchie also informed Mehilove that he was free to leave but, in the interest of officer safety, if he left he could not return during the search.  (Tr. 11).   Inspector Bouchie also told Mehilove that he was not under arrest and that he would not be arrested at the search's conclusion.  (Tr. 11).

Upon Inspector Western's arrival, he explained to Mehilove the search procedure and that officers would leave at the completion of the search.  (Tr. 12).  Inspector Western also told Mehilove that he was not under arrest and that he would not be arrested at the search's conclusion.  (Tr. 12).  Then, Inspector Western read Mehilove his *Miranda* rights to remain silent, consult an attorney, and end the interview at any time.  (Gov't Ex. 2A); (Tr. 12-13). Inspector Western testified that Mehilove acknowledged understanding his *Miranda* rights and agreed to talk.  (Tr. 13).

Throughout the search and interview, Mehilove's wife was inside the house, and, according to Mehilove, was frightened.  (Tr. 13-14, 23-24).  After he told inspectors that his wife

---

[3] The Government's brief (Gov't Mem.) (Doc. No. 35, at 3) refers to Inspector Bouchie as "Barry Bouchie," whereas at the hearing, Inspector Western referred to him as "Greg Bouchie."  (Tr. 3).

3

was in the house, Mehilove went upstairs with several agents to talk to his wife. (Tr. 25). No one asked Mehilove's wife to leave during the search; she may have left the home shortly before the search ended. (Tr. 26). During the two-hour interview at Mehilove's dining room table, an officer brought Inspector Western a laptop cord and informed Western that officers could not find the corresponding laptop. (Tr. 13-14, 24). Mehilove located the laptop at the officers' request. (Tr. 13-14). Mehilove also gave verbal consent for officers to search a Mercedes Benz in the garage that was not listed in the search warrant application and a locked safe in Mehilove's closet. (Tr. 14).

Mehilove left the dining room table several times during the interview to get a drink of water and get food out of the refrigerator. (Tr. 14). At no time did Mehilove invoke his right to remain silent or ask for an attorney. (Tr. 14-15). Inspectors Western and Bouchie did not make any threats or promises to Mehilove during the interview. (Tr. 15). When Mehilove told the inspectors that he was tired and wanted to lie down, the interview concluded. (Tr. 16, 25). Law enforcement discovered evidence on Mehilove's laptop, thumb drives, hard drive, and SIM cards, all of which were seized during the search. (Tr. 24-25). Inspector Western prepared a Memorandum of Interview at the conclusion of the interview. (Gov't Ex. 2); (Tr. 15-16).

### B. April 7, 2009

Mehilove called Inspector Western on April 7, 2009. (Tr. 16-17). During the 15-minute phone interview, Inspector Western did not ask any questions. (Tr. 17). Mehilove told Inspector Western that his immigration lawyer advised him not to speak with law enforcement. (Tr. 17). Inspector Western prepared Memorandum of Interview at the conclusion of this interview. (Gov't Ex. 3); (Tr. 17-18).

**C. May 21, 2009**

Inspector Western also met with Mehilove on May 21, 2009, outside the Bloomington Police Department to return property seized during the search including a computer. (Tr. 18). Inspector Western met with Mehilove along with Postal Inspector Livingston in a six or eight by ten foot interview room with a table and several chairs and a closed, unlocked door located outside the Police Department lobby. (Tr. 19, 21-22). Mehilove was not under arrest during the interview, nor was he told that he would be arrested that day. (Tr. 19). Inspector Western read Mehilove his rights from a Postal Inspector *Miranda* card. (Gov't Ex. 2A); (Tr. 19). Mehilove understood these rights and agreed to talk with the inspectors. (Tr. 19). Again, Mehilove did not invoke his right to remain silent or ask for an attorney, nor did the inspectors make any threats or promises. (Tr. 19). At the conclusion of the interview, Inspector Western prepared a Memorandum of Interview. (Gov't Ex. 4); (Tr. 20).

### III. DISCUSSION

Mehilove moves to suppress the statements he made to law enforcement prior to his arrest by arguing that the interviews were custodial interrogations and that his statements were not voluntary. Mehilove also moves to suppress the evidence seized from his home contending that the search warrant lacked probable cause; he makes his search warrant argument based on the four corners of the document and nothing else. (Tr. 5-6). The Court recommends that Mehilove's motions be denied.

**A. Mehilove's Statements Should Not be Suppressed Because the Interviews Were Non-Custodial and Voluntary.**

Generally, a law enforcement officer must advise a person of his *Miranda* rights before interrogating a suspect in a custodial setting. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S. 292, 297 (1992). *Miranda* defines custodial interrogation as

"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (citing *Miranda*, 384 U.S. at 444). An interrogation includes either express questioning or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. *Id.*; *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The Eighth Circuit identified several non-exhaustive "indicia of custody" to aid courts in determining whether a *Miranda* warning was required:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007).

Whether consent is voluntary or the result of duress or coercion is a question of fact determined from the totality of the circumstances. *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009); *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009). In the Eighth Circuit, the following factors should be considered in evaluating the voluntariness of consent:

6

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his *Miranda* rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. *Arciniega*, 569 F.3d at 398; *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990). No single factor is dispositive or controlling. *Bradley,* 234 F.3d at 366 (citing *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993)).

First, the Court will evaluate in the totality of the circumstances whether Mehilove was in custody during any of the three interviews. *See Griffin*, 922 F.2d at 1349; *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007). Second, the Court will analyze whether Mehilove's consent to speak with the inspectors was voluntary. *Arciniega*, 569 F.3d at 398; *Bradley*, 234 F.3d at 366; *Chaidez*, 906 F.2d at 381.

**1. April 3, 2009 Interview**

Applying the *Griffin* factors to the interview, Mehilove was not in custody when he spoke with Inspectors Western and Bouchie at his home. 922 F.2d at 1349. Inspectors Bouchie and Western separately told Mehilove he was free to leave during the interview. (Tr. 11-12). Mehilove was advised that when the search and interview concluded, the inspectors would leave his home and he would not be arrested. (Tr. 12). For officer safety reasons, inspectors would not have allowed Mehilove to leave his home and return before the search concluded, yet

Mehilove's conduct in leaving the table to retrieve food and drink and to speak with his wife demonstrates his freedom of movement during the interview. (Tr. 11, 14-15). Despite Mehilove's emphasis on the presence of his allegedly frightened wife in his home during the interview, Inspectors Western and Bouchie did not make threats or employ coercive tactics. (Tr. 13-15, 23-24). The presence of weapons and inspector uniforms did not constitute a police-dominated atmosphere, particularly in light of the fact that the inspectors promptly ended the interview when Mehilove said he was tired. (Tr. 16, 23-25). Contrary to Mehilove's assertions, the interview was non-custodial and the inspectors were not required to *Mirandize* Mehilove.

Even though Mehilove was not in custody, Inspector Western properly *Mirandized* him. (Tr. 13); *see Hogan*, 539 F.3d at 916, 921 (citing *Miranda*, 384 U.S. at 444). Mehilove said that he understood his *Miranda* rights and agreed to speak with the inspectors. (Tr. 13). Mehilove did not ask for an attorney or invoke his right to remain silent at any point during the approximately two-hour interview. (Tr. 14-15). Thus, even if Mehilove were in custody, any incriminating statements Mehilove gave were voluntarily and occurred after Inspector Western specifically advised of him of his *Miranda* rights. (Tr. 13-15); *see, e.g., Arciniega*, 569 F.3d at 398; *Bradley*, 234 F.3d at 366; *Chaidez*, 906 F.2d at 381.

### 2. April 7, 2009 Phone Call

The non-custodial statements Mehilove made in an April 7, 2009 phone call to Inspector Western did not require a *Miranda* warning. Significantly, Mehilove initiated the phone call. (Tr. 16-17). During the brief, 15-minute conversation, Inspector Western did not ask Mehilove any questions. (Tr. 16-17). As such, no indicia of custody, coercion, or a law-enforcement dominated atmosphere were present. *See Griffin*, 922 F.2d at 1349. Inspector Western was not required to read Mehilove his *Miranda* rights before Mehilove made voluntary statements during

the phone call. *See, e.g., Arciniega*, 569 F.3d at 398; *Bradley,* 234 F.3d at 366; *Chaidez*, 906 F.2d at 381.

### 3. May 21, 2009 Interview

The brief interview Inspector Western conducted outside the Bloomington Police Department on May 21, 2009 was non-custodial. The purpose of the meeting was to return property that Postal Inspectors seized from Mehilove's home pursuant to the search warrant. (Tr. 18). Inspector Western spoke with Mehilove in an unlocked room outside the police department; Mehilove was free to leave. (Tr. 19, 21-22). As with the interview on April 3, 2009, Inspector Western made no promises or threats but rather advised Mehilove that he was not under arrest and that he would not be arrested at the conclusion of the interview. (Tr. 19). Mehilove was not in custody. *See Griffin*, 922 F.2d at 1349.

Though a *Miranda* warning was unnecessary, Inspector Western nonetheless read Mehilove his rights. (Tr. 19). Mehilove acknowledged that he understood his rights and proceeded to speak with the inspectors. (Tr. 19). During the interview, Mehilove neither exercised his right to remain silent nor requested an attorney. (Tr. 19). Mehilove spoke with the inspectors voluntarily in a non-custodial setting after receiving and acknowledging his *Miranda* rights. *See*, *e.g.*, *Arciniega*, 569 F.3d at 398; *Bradley*, 234 F.3d at 366; *Chaidez*, 906 F.2d at 381. Accordingly, the Court finds no basis for suppressing Mehilove's statements and recommends that his Motion to Suppress Statements be denied.

### B. The Seizure and Subsequent Forensic Search of Mehilove's Computer and Thumb Drives Was Within the Scope of the Search Warrant.

With respect to Mehilove's Motion to Suppress Search and Seizure, both parties rested on the four corners of the warrant Magistrate Judge Mayeron signed on April 3, 2009. (Gov't Ex. 1, at 18-22). When no evidence is presented to a magistrate judge regarding a search, the court

must make a probable cause determination based only on information found within the four corners of the affidavit supporting the warrant. *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008); *United States v. Olvey*, 437 F.3d 804, 807 (8th Cir. 2006). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *Hudspeth*, 525 F.3d at 674 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). There must also be a nexus between the items to be seized and criminal behavior. *Warden v. Hayden*, 387 U.S. 294, 306-07 (1967).

A court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir. 1983); *see United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000). Likewise, officers may make reasonable inferences when preparing affidavits in support of a warrant. *Thompson*, 210 F.3d at 860.

Even if a search warrant is not supported by probable cause, a court may deny a suppression motion if the good-faith exception applies. Under the good-faith exception to the exclusionary rule, "evidence seized pursuant to a search warrant . . . that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007) (citing *United States v. Leon*, 468 U.S. 897,

923 (1984)).  The *Leon* good-faith exception is lost, however, when an officer relies on a warrant for which the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Leon*, 468 U.S. at 923; *see Ross*, 487 F.3d at 1122.

**1. Probable Cause Supported the Search Warrant.**

The four corners of the search warrant and supporting 23-page affidavit provide ample probable cause to search the items and areas it identifies.  The U.S. Postal Inspection Service conducted a two-year investigation into the use of several Stamps.com meters to counterfeit postage meter stamps.  (Gov't Ex. 1).  Inspector Western's investigation revealed that several meters used in the alleged counterfeiting were traced to Mehilove and his aliases. (Gov't Ex. 1) Postal Inspectors confirmed that addresses linked to the postage meters used to create counterfeit stamps were connected to Mehilove.  (Gov't Ex. 1).  Inspector Western's affidavit provides a sufficient basis from which to establish a fair probability inspectors would find evidence of postage counterfeiting on Mehilove's computers and electronic storage devices.

Even if Inspector Western's affidavit did not provide sufficient probable cause for the search at Mehilove's home in Prior Lake, the executing officers' reliance on the warrant was objectively reasonable under *Leon*.  468 U.S. at 923.  Inspector Western's 23-page affidavit demonstrated extensive evidence of postage meter counterfeiting.  (Gov't Ex. 1).  The affidavit also detailed significant evidence of Mehilove's criminal enterprise supporting the allegation that Mehilove acted in concert with other parties to distribute mail with counterfeit meter stamps. (Gov't Ex. 1).  Given the logical inference that an individual engaged in counterfeiting would have evidence or proceeds of such activity in his residence, the inspectors' reliance on the warrant was reasonable.  The affidavit and warrant were not "so lacking in indicia of probable

cause" as to make it "entirely unreasonable" for officers to rely on the warrant. *Leon*, 468 U.S. at 923; *see Ross*, 487 F.3d at 1122.

### 2. The Scope of the Search Warrant Extended to the Subsequent Search of Mehilove's Laptops, Computers, Thumb Drives, and Hard Drives.

Mehilove's only specific objection to the search and seizure of items from his home is that the subsequent forensic search of his computers, laptops, thumb drives, and hard drives exceeded the scope of the search warrant. (Def.'s Mem. at 5). A warrant that identifies the items to be searched with sufficient particularly to ensure that law enforcement does not search and seize the wrong items satisfies the Fourth Amendment. *See United States v. Thomas*, 263 F.3d 805, 807 (8th Cir. 2001). The probable cause supporting a warrant that specifically identifies the possibility of and process for additional searches extends to later forensic searches. *See United States v. Houston*, 754 F. Supp.2d 1059, 1071-73 (D.S.D. Oct. 7, 2010) (upholding forensic examination of defendants computers and electronic media storage devices).

Here, the Search Warrant Addendum stated that law enforcement would search electronic files, documents, or other electronically stored information that the government seized pursuant to the warrant. (Gov't Ex. 1, at 24). The addendum was attached to the warrant Magistrate Judge Mayeron signed on April 3, 2009. (Gov't Ex. 1, at 1). Thus, the search warrant contemplated subsequent forensic searches of the items inspectors seized from Mehilove's residence, and thus probable cause explicitly extended to the "Attached List of Items to be Seized, subject to search warrant addendum." (Gov't Ex. 1, at 1). In the totality of the circumstances, it was objectively reasonable for the officers to rely on the validity of the search warrant. The search and seizure did not violate Mehilove's Fourth Amendment rights.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Mehilove's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 21] be **DENIED**; and

2. Defendant Mehilove's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 22] be **DENIED**.

Dated: September 15, 2011

                                                *s/Steven E. Rau*
                                                Steven E. Rau
                                                U.S. Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **September 29, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.